**UNITED STATES of America**

v.

**Adolfo L. GUTIERREZ, Defendant.**

**No. 94–CR–939 (JS).**

United States District Court,
E.D. New York.

June 29, 1995.

U.S. Attorney's Office, E.D.N.Y. by Edgardo Ramos, Asst. U.S. Atty., Garden City, NY, for prosecution.

Milner & Daniel by Emily R. Daniel, New York City, for defendant.

### MEMORANDUM AND ORDER

SEYBERT, District Judge:

In the instant prosecution, defendant Adolfo L. Gutierrez is charged with possession of cocaine with the intent to distribute, and conspiracy to possess cocaine with the intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(ii), and 18 U.S.C. § 2. The defendant initially was arrested on February 24, 1992, after a warrantless search by law enforcement agents disclosed approximately three kilograms of cocaine in the trunk of the automobile he was driving. He was released the next day without being formally charged. According to the Government, both the means whereby the defendant was searched and arrested, and the delay in bringing formal charges against him, stemmed from an ongoing investigation of an individual named Eliseo Navarette, who purportedly was engaged in drug trafficking and money laundering activity in the New York City area.

On June 15, 1993, after the Navarette investigation had been completed, the Government filed a complaint, and obtained a warrant for the defendant's arrest, based on the aforementioned seizure of contraband on February 24, 1992. The defendant was arrested pursuant to this warrant on August 30, 1994, as he arrived at Miami International Airport upon disembarking a flight from Colombia. He subsequently was indicted on September 8, 1994.

The defendant now moves to dismiss the indictment on Sixth Amendment speedy trial grounds, and to suppress all physical and testimonial evidence obtained from him, and the automobile he was driving, on February 24, 1992. A hearing was held concerning these matters on June 6, 1995, whereupon testimony was provided by Sergeant George Hanken and Detective Dennis Casey of the New York City Drug Enforcement Task Force. For the reasons that follow, the defendant's motions are denied in their entirety.

### DISCUSSION

I. Sixth Amendment Speedy Trial Claim

The Sixth Amendment provides in pertinent part that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial...." U.S. Const. amend. VI. This right attaches when the putative defendant in some way becomes an accused, which means at the time of the indictment, the information, or the arrest, whichever comes earlier. *See United States v. MacDonald,* 456 U.S. 1, 7, 102 S.Ct. 1497, 1501, 71 L.Ed.2d 696 (1982) ("Although delay prior to arrest or indictment may give rise to a due process claim under the Fifth Amendment, or to a claim under any applicable statutes of limitations, no Sixth Amendment right to a speedy trial arises until charges are pending.") (citing *United States v. Lovas-*

*co*, 431 U.S. 783, 788–89, 97 S.Ct. 2044, 2047–48, 52 L.Ed.2d 752 (1977)); *United States v. Marion*, 404 U.S. 307, 320, 92 S.Ct. 455, 463, 30 L.Ed.2d 468 (1971).

■ The Supreme Court instructs that the following four factors be considered in evaluating whether a criminal defendant's Sixth Amendment right to a speedy trial has been violated: (1) whether the "delay before trial was uncommonly long" (i.e., this refers to the duration of time between (a) the earlier of the arrest or indictment, and (b) the filing of the motion to dismiss the indictment); (2) "whether the government or the criminal defendant is more to blame for that delay;" (3) "whether, in due course, the defendant asserted his right to a speedy trial" (this considers whether the defendant knew of the charges pending against him); and (4) the prejudice sustained by the defendant as a result of the delay. *Doggett v. United States*, 505 U.S. 647, 651, 112 S.Ct. 2686, 2690, 120 L.Ed.2d 520 (1992); *see Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972). In *Doggett*, the Supreme Court held that a delay of eight-and-one-half years between the defendant's indictment and his arrest violated his Sixth Amendment right to a speedy trial, where the Government was negligent in pursuing the defendant during that period of time, and six years of the delay was attributable to the Government's negligence. *See Doggett*, 505 U.S. at 657–58, 112 S.Ct. at 2694.

■ A delay of one year is sufficient to trigger judicial review for a Sixth Amendment violation. *See id.* Further, where this threshold period of delay is exceeded, an accused need not show actual prejudice since excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or identify, such as through the loss of witnesses, or the dimness of memories. *See id.* at 652, 656, 112 S.Ct. at 2691, 2693. This presumption increases in importance with the length of the delay. *See id.* at 656–57, 112 S.Ct. at 2693.

■ As a threshold issue, however, the Court first must determine from what point the Sixth Amendment speedy trial clock begins to run. The parties are in dispute as to this matter; the Government contends that the speedy trial clock runs from the defendant's arrest pursuant to an outstanding arrest warrant, on August 30, 1994, while the defendant argues that the clock runs from the defendant's initial arrest, on February 24, 1992. The parties cite *United States v. Bloom*, 865 F.2d 485 (2d Cir.), *cert. denied*, 490 U.S. 1027, 109 S.Ct. 1762, 104 L.Ed.2d 197 (1989) as relevant precedent within the Second Circuit. The following language in *Bloom* is decisive in resolving this dispute:

> [T]he key Sixth Amendment issue is whether [the defendant] was either arrested or subjected to substantial restrictions *for purposes of answering a criminal charge.* We believe he was not, for the reasons stated above. *The restrictions imposed after his prompt release were intended only to protect an ongoing investigation and did not trigger Sixth Amendment rights.*

*Id.* at 491 (emphasis added).

■■ In the instant case, as in *Bloom*, defendant Gutierrez was promptly released upon his initial arrest, without being criminally charged, in order to protect an ongoing investigation. A federal warrant for the defendant's arrest was not obtained until June 15, 1993, and Gutierrez was not subsequently arrested until August 30, 1994, when he attempted to re-enter the United States from Colombia. Accordingly, Gutierrez' Sixth Amendment speedy trial rights were not implicated until August 30, 1994, the date on which he was arrested pursuant to an outstanding arrest warrant. Because less than six months elapsed between this date and February 24, 1995—the date that the defendant filed the present motion to dismiss the indictment—there is no basis for Gutierrez to argue that his Sixth Amendment rights have been violated. *See United States v. Vassell*, 970 F.2d 1162, 1164 (2d Cir.) ("Unless the delay [is 'presumptively prejudicial'], examination of the other *Barker* factors is unnecessary."), *cert. denied*, —— U.S. ——, 113 S.Ct. 627, 121 L.Ed.2d 559 (1992). This result is reinforced through the application of the other *Barker* factors, and in particular, the ab-

sence of prejudice to the defendant.[1] Accordingly, the defendant's motion to dismiss the indictment is denied.

## II. Suppression Motion

The defendant moves to suppress the evidence obtained by the police through a warrantless search of an automobile he was driving, on February 24, 1992. In addition to disputing the existence of probable cause to support a warrantless search of this vehicle pursuant to the "automobile exception" to the warrant requirement, and the voluntariness of his consent to this warrantless search, the defendant contends that his Fourth Amendment rights were violated through the use of pretext to procure his putative consent to search the vehicle.

Having considered the evidence presented at the suppression hearing on June 6, 1995, as well as the submissions of the parties, including the defendant's affidavit concerning his lack of familiarity with English, the Court enters the following findings of fact and conclusions of law.

### A. *Findings of Fact*

1. In early 1992, an informer came into the office of the New York City Police Department to provide information concerning an individual named Eliseo Navarette. This information included Navarette's address, the vehicle he was driving, and the type of business he was engaged in. Among the police officers to hear this information was Sergeant George Hanken, who had been employed by the New York City Police Department since 1973, and was assigned to the Joint Narcotics Task Force, which worked in tandem with the Federal Bureau of Investigation [FBI]. Sergeant Hanken already was familiar with Navarette's name, having previously been informed by Helson Santiago, a detective employed by the Money Laundering Task Force of the Organized Crime Investigation Division, that Navarette was engaged in money laundering activity. Tr. at 8–10, 50–52, 54. Based upon this information, Sergeant Hanken believed Navarette to be a major importer and distributor of cocaine, as well as a money launderer. *Id.* at 10.

2. Sergeant Hanken thereafter supervised surveillance activity in an attempt to corroborate the information that had been provided to him. This surveillance activity, which included a review of telephone and other utility records, corroborated the information provided by the informer concerning Navarette's physical appearance, place of residence, and use of a black van. *Id.* at 11–12.

3. On February 24, 1992, while surveillance was being conducted of Navarette's reputed residence, located at 14th Road in the College Point section of Queens, a man matching Navarette's description exited the residence and drove off in the black van. *Id.* at 11, 13. At approximately 5:55 P.M., the van pulled over to the curb on 35th Avenue near 82nd Street. At that point, Sergeant Hanken surveilled from behind the van, and maintained communication with other police units by hand-held radios. *Id.* at 13–14, 60.

4. As Sergeant Hanken watched, an unidentified woman approached the van, carrying a large pocketbook, and subsequently entered the van. The van then began to move slowly towards the corner of 83rd Street, still on 35th Avenue. As the van reached this corner, a male (later identified as Adolfo L. Gutierrez, the defendant) approached the van, without carrying anything in his hands, and had a conversation with a person seated in the van through the passenger-side window. The unidentified woman

---

1. The Court expressly finds that, under the facts of this case, the defendant's Sixth Amendment rights still would not have been violated had the speedy trial clock been triggered on February 24, 1992. Specifically, the Court notes that the defendant was in Colombia for most of the period in question, and was promptly arrested upon his return to the United States. Consequently, the Government's culpability in bringing about this delay is not substantial. Moreover, there is no basis for the Court to conclude that the defen-dant has sustained actual prejudice through the Government's delay in prosecuting him. In connection with this matter, the Court notes that Gutierrez' claim, that he is unable to locate the person who lent him the automobile from which the contraband in question was seized, remains inchoate, because there is no basis for the Court to conclude at this juncture that the owner of the vehicle will not be found before trial. *See infra* Part II, Findings of Fact ¶¶ 9–10.

then exited the van carrying a tube-type gym bag, which was noticeably different than the pocketbook with which she had entered the van. Although Sergeant Hanken radioed other police officers concerning what he had observed, efforts to locate the woman were unsuccessful. *Id.* at 14–16.

5. While Sergeant Hanken looked on, the black van pulled passed him and stopped approximately four to five car lengths ahead of him. At that point, the man whom Hanken had observed in conversation with the van's driver—and whom previously had been empty handed—emerged from the van carrying a white, plastic shopping bag bearing an "I Love New York" logo. This bag appeared to be weighted in view of the creases in the bag's handles. *Id.* at 15–16. Based upon these circumstances, including the information that had been provided to him concerning Navarette, Sergeant Hanken believed the bag to contain contraband. *Id.* at 30, 47.

6. As the van drove away, Sergeant Hanken observed the defendant walk to an automobile parked on the opposite side of the street, whereupon he deposited the bag in the vehicle's trunk, got into the car, and drove off. *Id.* at 16. It took between one to two minutes for the defendant to walk from the black van to the car. *Id.* at 36, 89. Based upon his experience in surveilling other drug transactions, the defendant's manner of walking indicated to Sergeant Hanken a consciousness of surveillance. *Id.* at 49; *see also id.* at 63–65, 89 (testimony of Detective Dennis Casey concerning the defendant's surveillance-conscious behavior).

7. Rather than arrest the defendant at that point, Sergeant Hanken allowed Gutierrez to drive away to avoid compromising the investigation of Navarette. *Id.* at 32. He then radioed to other police officers under his command, including Detective Dennis Casey, and instructed them to stop the defendant's car, and to provide a false reason to the defendant for the stop. *Id.* at 42–43.

8. After the defendant's automobile was stopped by the police, Detective Casey approached the vehicle with his gun in his holster. Upon the defendant's compliance

with Casey's request to turn off the ignition, Detective Casey, addressing the defendant in English, asked to be shown papers establishing the defendant's ownership of the automobile. The defendant was unable to produce such papers, and instead presented a New York State driver's license bearing the name of Adolfo Gutierrez. *Id.* at 67–68.

9. Responding in English to Detective Casey's questions, the defendant stated that he lived in Woodside, Queens, and did not have the car registration on him. He further stated that he was on his way to visit a friend in New Jersey, having entered the United States on a visa from Costa Rica, and that his mother resides in Costa Rica, while his father is Colombian. The defendant moreover responded that the car belonged to a friend named Michael, but that he did not know Michael's last name, where he resided, his phone number, or how he would return the car to him. *Id.* at 68–69, 92.

10. Upon obtaining the defendant's pedigree information, Detective Casey told Gutierrez that the car he was driving matched the description of an automobile that had been used in an armed robbery earlier that day. This statement was known by Detective Casey to be false. *Id.* at 69–70, 96–97. Shortly thereafter, the other police officers present verified through a check of records that the defendant's automobile was registered to an individual named John Taylor, who resided at 75–14 Roosevelt Avenue, in the Jackson Heights section of Queens. This address was known by the officers present, including Detective Casey, to be a mail box drop, which often was employed by drug couriers and money launderers as a device to avoid detection by the police. *Id.* at 71–72.

11. Upon confronting the defendant with this information, Detective Casey showed him a written copy of a consent-to-search form, and asked if he had drugs, large sums of money, or weapons in the car.[2] Casey also asked the defendant if he could search the vehicle for weapons. *Id.* at 72–73, 99. Prior to this request, Detective Casey already had obtained possession of the defendant's car keys. *Id.* at 74, 99–100. With considerable

---

2. No *Miranda* warnings were administered to the

defendant prior to this questioning. *Id.* at 94–95.

nervousness, the defendant verbally acquiesced to the search,[3] but refused to sign the consent form. *Id.* at 72–73, 99.

12. Upon opening the automobile's trunk, Detective Casey found a plastic bag bearing an "I Love New York" logo, which contained three brick-shaped packages that he believed to hold cocaine. Thereupon, the defendant was handcuffed and transported to the 115th precinct stationhouse. Detective Casey, along with Detective Santana, then elicited, in English, additional pedigree information from the defendant. The defendant responded to the police officers' questions in English. *Id.* at 74–76. *Miranda* warnings, however, were administered to the defendant in Spanish. *Id.* at 102.

13. The police officers at the scene subsequently reported the circumstances attending the defendant's arrest on FBI Form 302, dated February 26, 1992, which among other things, omitted any reference to the Navarette investigation. *See* Gov't Ex. 3500–1.

14. Upon consideration of their testimony, the Court finds that Sergeant Hanken was more familiar than Detective Casey with the Navarette investigation, and with the details of the surveillance of Navarette that was conducted on February 24, 1992. The Court further finds that Sergeant Hanken, relative to Detective Casey, had a better opportunity to observe the entry and departure of the unidentified woman, and the defendant, with respect to Navarette's van.

### B. *Conclusions of Law*

■ Under the automobile exception to the warrant requirement, if the police have probable cause to believe that a specific vehicle is carrying contraband, they may conduct a warrantless search of the vehicle and any containers therein. *See California v. Carney,* 471 U.S. 386, 394, 105 S.Ct. 2066, 2071, 85 L.Ed.2d 406 (1985); *United States v. Ross,* 456 U.S. 798, 823–24, 102 S.Ct. 2157, 2172, 72 L.Ed.2d 572 (1982); *Carroll v. United States,* 267 U.S. 132, 147, 45 S.Ct. 280, 283, 69 L.Ed. 543 (1925); *United States v. Harwood,* 998 F.2d 91, 96 (2d Cir.) (citing

*Carroll,* 267 U.S. at 156, 45 S.Ct. at 286), *cert. denied,* —— U.S. ——, 114 S.Ct. 456, 126 L.Ed.2d 388 (1993). The automobile exception draws its justification from the mobility of the vehicle, and the reduced expectations of privacy resulting from the pervasive regulatory scheme to which automobiles are subject. *See Carney,* 471 U.S. at 392, 105 S.Ct. at 2070. Under this exception, " 'only the prior approval of the magistrate is waived; the search otherwise must be such as the magistrate could authorize.' " *Carney,* 471 U.S. at 394, 105 S.Ct. at 2071 (quoting *Ross,* 456 U.S. at 823, 102 S.Ct. at 2172).

■ In order to establish probable cause, it is not necessary to make "a prima facie showing of criminal activity" or to demonstrate that it is more likely than not that a crime has been, or is being committed. *United States v. Travisano,* 724 F.2d 341, 346 (2d Cir.1983). Rather, probable cause "exists where 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949) (quoting *Carroll,* 267 U.S. at 162, 45 S.Ct. at 288); *see United States v. Cruz,* 834 F.2d 47, 50 (2d Cir.1987), *cert. denied,* 484 U.S. 1077, 108 S.Ct. 1056, 98 L.Ed.2d 1018 (1988).

■ In determining whether probable cause exists, a court must evaluate the "totality of the circumstances" to ascertain whether there was "a fair probability that contraband or evidence of a crime [would] be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). Among other things, this evaluation must take into account the experience, special training and expertise possessed by the law enforcement officials in question in connection with their drawing of inferences of criminal activity from behavior which might not suggest criminal activity to a lay person. *Cf. United States v. Tussa,* 816 F.2d 58, 62 (2d Cir.1987) (Probable cause to

---

**3.** Detective Casey testified that he would not have searched the automobile had the defendant refused to consent. *Id.* at 98–99.

arrest existed when suspect's involvement in meetings with suspected drug dealers, behavior suggesting fear of surveillance, and delivery of package to an automobile in which the suspect was a passenger, enabled an experienced officer to infer that the suspect possessed heroin.).

■■■■ In the instant case, the Court finds that the Government has sustained its burden of demonstrating that the police possessed probable cause to believe that the vehicle in question was carrying contraband, so as to justify a warrantless search of its trunk for the purpose of revealing the contents of the bag that Gutierrez had deposited there. *See Ross*, 456 U.S. at 823–24, 102 S.Ct. at 2172. Among the circumstances that lead the Court to this conclusion are: (i) the intelligence possessed by law enforcement officers concerning Eliseo Navarette's suspected drug trafficking and money laundering activities; (ii) the subsequent information obtained by law enforcement officers from a confidential source concerning Navarette's continued drug dealing; (iii) the police surveillance of Navarette on the night of the defendant's arrest; (iv) the suspicious nature of Navarette's meeting with an unknown woman on the night of the arrest; (v) the fact that the unknown woman entered Navarette's van with one bag and exited shortly thereafter carrying a different bag; (vi) the fact that the defendant entered the van empty handed, "squared the block" with Navarette, and then exited the van carrying a weighted bag; and (vii) the defendant's surveillance-conscious behavior. Based upon the totality of the circumstances, the arresting officers had sufficient probable cause to arrest the defendant at the moment he exited Navarette's van, and to conduct a warrantless search of the bag incident to a lawful arrest. In view of the substantial security concerns presented, and moreover, the desire of the police not to compromise the Navar-

ette investigation by arresting the defendant near the "meet location," the police were well within their authority to stop and search the defendant's automobile shortly after he left the location where he had met Navarette.[4]

■■■■ The Court notes that, in reaching this determination that probable cause existed to justify a warrantless search of the defendant's automobile, it is mindful of the testimony provided at the suppression hearing by Detective Casey, the police officer who stopped the defendant's vehicle and searched its trunk. Specifically, Detective Casey testified that he would not have searched the automobile had the defendant refused to consent. Tr. at 98–99; *see supra* Footnote 4 (noting substantial question concerning the voluntariness of the defendant's consent). While this testimony, along with the contradictory testimony of Sergeant Hanken concerning his belief that consent was not required, *see supra* Findings of Fact ¶ 14, are among the many factors that this Court has considered in evaluating probable cause, the Court regards the totality of the circumstances amply to support the objective conclusion that a person of reasonable caution, in light of all the circumstances, would believe that a drug transaction had just occurred, and that the defendant had placed contraband in the trunk of his automobile. *See Brinegar*, 338 U.S. at 175–76, 69 S.Ct. at 1311; *Cruz*, 834 F.2d at 51. Accordingly, Detective Casey's testimony does not prevent the Court from concluding that the law enforcement officers had probable cause to support a warrantless search of the defendant's vehicle.

■■■■ The defendant contends, however, that even assuming the existence of probable cause, the subject search was rendered unlawful through the officers' use of pretext in securing the defendant's consent to search

4. Because the Court finds that the law enforcement officers had probable cause to conduct a warrantless search of the defendant's vehicle pursuant to the automobile exception to the warrant requirement, it is unnecessary for the Court to determine whether the defendant's consent to a search of his automobile provides an independent basis to support a lawful warrantless search. The Court notes in passing, however,

that the testimony presented at the suppression hearing, including Detective Casey's acknowledgment of his misrepresentation to the defendant concerning the true nature of the search, and the fact that *Miranda* warnings subsequently were administered to the defendant in Spanish, cautions against a finding that the defendant's consent was voluntarily secured.

 

the vehicle's trunk. Citing *United States v. Scopo,* 19 F.3d 777 (2d Cir.), *cert. denied,* — U.S. ——, 115 S.Ct. 207, 130 L.Ed.2d 136 (1994), the defendant argues that this search was rendered unlawful under the Fourth Amendment through Detective Casey's knowingly false representation to him that a robbery recently had taken place in the vicinity, and that his car matched the description of an automobile used in this robbery. *See supra* Findings of Fact ¶ 10. According to the defendant, this lie was not "authorized by law," and therefore stands in contrast to the "legitimate" traffic violation in *Scopo,* which had served as a "lawful" pretextual basis to support the seizure from an automobile of a fully-loaded .38–caliber pistol. In *Scopo,* the police detectives observed this firearm in "plain view," upon stopping an automobile for a traffic infraction with the hope of discovering evidence of a more serious offense. *See Scopo,* 19 F.3d at 780, 784.

■ The defendant's reliance upon *Scopo* is misplaced, however, since this Court has determined that the subject search *was* authorized by law pursuant to the automobile exception to the warrant requirement. Indeed, the reasoning of *Scopo* directs the denial of the defendant's suppression motion, because absent a violation of the Equal Protection Clause, the use of pretext is irrelevant to the Fourth Amendment analysis so long as the court is satisfied that the underlying basis for the search was authorized by law. *See id.* at 784; *United States v. Nersesian,* 824 F.2d 1294, 1316 (2d Cir.) (As long as a "valid basis for a detention and search ... exists ... [it] is not rendered invalid by the fact that police resort to a pretext for one purpose or another to continue that detention and search."), *cert. denied,* 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987); *see also Scopo,* 19 F.3d at 785–86 (Newman, C.J., concurring) (addressing equal protection concerns). In the instant case, the Court has found probable cause to exist, and therefore to supply the requisite authorization for a warrantless search of the defendant's vehicle. Accordingly, the Court rejects the defendant's argument that the officers' search violated the Fourth Amendment.

## CONCLUSION

For the foregoing reasons, the defendant's motions to dismiss the indictment, and to suppress evidence seized by law enforcement officers on February 24, 1992, are denied.

SO ORDERED.